**WILLIAM A. GRAHAM COMPANY**

v.

**Thomas P. HAUGHEY, et al.**

**Civil Action No. 05–612.**

United States District Court,
E.D. Pennsylvania.

March 29, 2007.

David J. Wolfsohn, Aleksander J. Goranin, Chad E. Ziegler, Woodcock Washburn LLP, Philadelphia, PA, for Plaintiff.

Floyd Abrams, Jason R. Heller, Michael L. Yaeger, Cahill, Gordon & Reindel LLP, New York City, Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Elizabeth S. Campbell, Pepper Hamilton LLP, Philadelphia, PA, for Defendants.

### MEMORANDUM

BARTLE, Chief Judge.

Plaintiff William A. Graham Company ("Graham"), an insurance brokerage firm, filed this action against defendants Thomas P. Haughey ("Haughey"), a former employee of Graham, and USI Midatlantic, Inc. ("USI"), an insurance brokerage firm and Haughey's current employer. Plaintiff alleged that defendants infringed Graham's copyrights in its "Standard Survey and Analysis" and "Standard Proposal." After trial, the jury returned a verdict in Graham's favor and awarded damages in the amount of $16,561,230 against defendant USI and $2,297,397 against defendant Haughey. The damages represented defendants' profits from acts of infringement going back to 1992. 17 U.S.C. §§ 501, 504. On November 21, 2006, upon consideration of the defendants' post-trial motion, we granted a new trial on the question of whether plaintiff should have reasonably discovered its injuries prior to February 9, 2002, that is, prior to the expiration of the three-year statute of limitations provided by the Copyright Act, 17 U.S.C. § 507(b). Now pending before the court are: (1) plaintiff's motion for reconsideration of the court's November 21, 2006 Order; (2) defendants' motion for partial summary judgment with respect to damages prior to February 9, 2002; (3) plaintiff's motion for summary judgment for the full amount of damages awarded by the jury; and (4) plaintiff's motion to vacate paragraph two of the court's November 21, 2006 Order, which granted defendants' motion for a new trial on the issue of statute of limitations, pursuant to Rule 60 of the Federal Rules of Civil Procedure.

### I.

As an initial matter, there is no dispute that it is proper for this court to consider a motion for summary judgment after it has granted a new trial. *See Limbach v. Sheet Metal Workers Int'l Ass'n,* 949 F.2d 1241, 1256 n. 12 (3d Cir.1991). Under Rule 56 of the Federal Rules of Civil Procedure, a moving party is entitled to summary judgment only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see Fed.R.Civ.P. 56(c). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (internal quotation and citation omitted). Although it is the province of the jury to determine issues of disputed fact, a court on summary judgment need not "turn a blind eye to the weight of the evidence; the 'opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348).

In its opposition to defendants' motion for partial summary judgment, Graham submitted new declarations from two witnesses who were previously deposed and who testified at trial. To the extent that these new declarations are inconsistent with the witnesses' prior testimony, we will disregard them under the "sham affidavit doctrine." As articulated by the Court of Appeals, this doctrine directs district courts to disregard a subsequent affidavit from a witness who has given prior testimony when "the affidavit comes in later to explain away or patch up [earlier testimony] in an attempt to create a genuine issue of material fact." *In re CitX Corp., Inc.,* 448 F.3d 672, 679 (3d Cir.2006); *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir. 1991).

## II.

Graham, as a commercial insurance brokerage firm, provides property and casualty insurance services to businesses. When soliciting a prospective client, Graham typically prepares a risk management study, called a "survey and analysis," which evaluates the prospective client's insurance needs. Graham's producers incorporate language from its Standard Survey and Analysis and its Standard Proposal (collectively the "Works") into the individualized survey and analysis and proposal prepared for each client. The allegations in this case stem from the use and copying of the Works by the defendants in connection with their business activities.

The Works consist of hundreds of pages contained in two binders and were derived from what Graham called the Standard Paragraphs which it developed in the 1980's. Graham employees used the language in the Standard Paragraphs to prepare surveys and analyses and proposals for clients and prospective clients to explain in lay language various insurance coverages and suggested coverages. The proposals created from the Standard Paragraphs and delivered to clients did not contain any copyright notice, and Graham did not impose any contractual limitation on the client's use of the proposal. In 1990, some of the language in the Standard Paragraphs was combined with new material to create the Works. It was at this time that Graham first began to affix copyright notices on individualized proposals prepared for and distributed to clients. On February 21, 1995, Graham filed two applications with the United States Copyright Office to register copyrights in certain portions of the Works. The Copyright Office issued two certificates of registration, effective February 21, 1995, for those portions of the Works in which copyright was claimed. In 2000, the Copyright Office issued two supplementary certificates of registration for the Works, effective October 25, 2000, based upon supplementary applications Graham had submitted.

From January, 1985 through September, 1991, defendant Thomas Haughey worked for Graham as a producer. During Haughey's employment with Graham he was one of eight employees who were given copies of the Works, and he used them extensively in his submissions to his clients and prospective clients. On September 11, 1991, Graham and Haughey entered into an agreement to terminate Haughey's employment. It included a provision that Haughey "reaffirms his continuing obligation, to abide by the terms, conditions and restrictions of the provisions of Paragraphs 3, 4 and 5 of the [1989 Employment Agreement]." These paragraphs prohibited Haughey from disclosing company information and retaining company documents after termination.

Upon leaving Graham, Haughey went to work as producer at another insurance brokerage firm, Flanigan, O'Hara, Gentry & Associates ("FOG"). Haughey took with him to FOG a set of the binders containing the Works. At FOG, Haughey copied language from the Works into written proposals for new clients. At some point in 1994 or 1995, FOG hired a temporary employee for the specific task of typing the language of the Works into its computer system. Paper copies were also distributed to employees at FOG. In March, 1995, USI Holdings acquired and merged with two other entities to create USI Midatlantic, Inc., the corporate defendant in this case. The Works were available to and used by USI employees. Defendants admit to incorporating portions of the Works into over 950 written proposals prepared for 315 clients. Graham learned of the copying in November, 2004, when it received a proposal from a client of the defendants while attempting to solicit that client's business. Graham filed this action for copyright infringement on February 8, 2005.

After a five day trial and after denying the defendant's motion for judgment as a matter of law, the court submitted special interrogatories to the jury. The jury first found that defendants had infringed Graham's copyright in the Works. We denied defendants' post-trial motion challenging this finding and it is not the subject of the present motion. The jury was then asked: "Prior to February 9, 2002, should plaintiff have discovered, with the exercise of reasonable diligence, that defendants were infringing its copyrights?" The jury responded "no."

### III.

We will begin by considering defendants' motion for summary judgment with respect to Graham's claim for damages prior to February 9, 2002.

The purpose of a statute of limitations is to "put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 352, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). The copyright statute provides a specific statute of limitations: "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). In the case of continuing copyright infringement, as here, "an action may be brought for all acts that accrued within the three years preceding the filing of the suit." *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir.1994). Graham, as noted above, filed this action on February 8, 2005. Consequently, under ordinary circumstances, the statute of limitations would bar any of Graham's copyright claims that accrued prior to February 9, 2002.

Courts have recognized that fairness dictates that the limitations period be tolled under certain circumstances. *See*

*Bohus v. Beloff,* 950 F.2d 919 (3d Cir.1991). Prior to trial in this case, our predecessor, the late Judge Clarence C. Newcomer, held that the discovery rule applies to claims for copyright infringement, including this one. Aug. 15, 2005 Order of Judge Newcomer (Docket Entry 31); Mem. Op. of Nov. 21, 2006 at 25–26. Under that rule, the statute of limitations on a copyright claim is tolled until "the moment [the copyright owner] has knowledge of the violation or is chargeable with such knowledge." *Id.; Polar Bear Productions, Inc. v. Timex Corp.,* 384 F.3d 700, 706–07 (9th Cir.2004). The determination of when knowledge will be imputed to a party under the terms of the discovery rule is presumptively a question for the jury but may be decided as a matter of law when the party invoking the rule does not present sufficient proof to send the issue to a jury. *See Smith–Haynie v. District of Columbia,* 155 F.3d 575, 579 (D.C.Cir. 1998); *Bohus,* 950 F.2d at 925.

 Proving the applicability of the statute of limitations usually falls on the defendant as an affirmative defense. *See* Fed.R.Civ.P. 8(c). When, however, as here, a plaintiff seeks the benefit of the discovery rule, the burden shifts to it to prove that in the exercise of reasonable diligence it should not have discovered the infringement before the statutory bar, in this case, February 9, 2002. *See Gould v. U.S. Dep't of Health and Human Services,* 905 F.2d 738, 745–46 (4th Cir.1990). Graham introduced evidence that defendants began their acts of infringement as far back as 1992. It is well settled in continuing infringement cases such as this that "[e]ach act of infringement is a distinct harm giving rise to an independent claim for relief." *Stone v. Williams,* 970 F.2d 1043, 1050 (2d Cir.1992); *Roley* at 481. Thus, even if Graham cannot prove that it was excused from discovering the pre-February 9, 2002 acts of infringements prior to that date, damages are still available in the form of defendants' profits arising from acts of infringement occurring on or after February 9, 2002.

 There is no evidence in the record that Graham actually knew of the defendants' infringement before 2004 when a Graham employee saw a copy of one of USI's infringing proposals. That, of course, is not sufficient to satisfy Graham's burden with respect to the discovery rule. We must decide whether Graham was chargeable with such knowledge more than three years before initiating suit. Graham must prove that in the exercise of reasonable diligence it *should* not have known before February 9, 2002 about any of defendants' previous acts of infringement. *Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992). When a plaintiff is aware of facts that furnish it with a potential claim, a duty of inquiry arises and "[p]laintiff is charged with whatever knowledge an inquiry would have revealed." *Id.* at 1049. Once a plaintiff has knowledge or imputed knowledge of a potential claim, the statute of limitations begins to run. *Cetel v. Kirwan Fin. Group, Inc.,* 460 F.3d 494, 508 (3d Cir.2006).

Although our Court of Appeals, so far as we can ascertain, has never addressed the question of inquiry notice in a copyright action, it has frequently confronted that issue in securities fraud and civil RICO cases. The discovery rule is a generally applicable doctrine which maintains the same basic formulation in each circumstance in which it applies. *See Rotella v. Wood,* 528 U.S. 549, 555–56, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). Thus, we see no reason why the Court of Appeals' analysis in securities fraud and civil RICO cases should not apply with equal force here as a way to specify the plaintiff's duty of reasonable diligence.

In a recent RICO action, the court employed a two-prong test to determine whether a plaintiff will be deemed to have

notice of its claims. *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 252 (3d Cir.2001), *see also Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mmgt., L.P.*, 435 F.3d 396, 400–01 (3d Cir.2006) (securities fraud). First, the defendant must come forward with evidence of the existence of "storm warnings," or "suspicious circumstances," that would alert a reasonable person that an investigation should be made. *Id.* After the defendant has done so, the burden of proof is then upon the plaintiff to establish that it was reasonably diligent in making an adequate investigation but was still unable to discover its injuries. *Id.* When a plaintiff has not been reasonably diligent in investigating "storm warnings" or "suspicious circumstances," it may not invoke the discovery rule and instead will be deemed to have notice of its claims. *Id.; Benak*, 435 F.3d at 400–01. Thus, in a copyright case when the discovery rule is not applicable, the plaintiff's damages will be limited to those available for the three year period prior to the filing of the lawsuit.

In our November 21, 2006 Memorandum in support of the Order granting a new trial on damages, we described the multitude of storm warnings that existed in this case. Graham disputes both the existence and the importance of many of these circumstances. We will reconsider each of the items defendants identify as storm warnings in light of Graham's arguments to the contrary.

First, Graham knew or should have known that Haughey's copy of the binders containing the copyrighted Works remained in his possession after he was terminated in the fall of 1991. It is undisputed that the two binders were quite voluminous with each containing hundreds of pages. At the time Haughey left Graham, there were only eight sets of the binders containing the Works. Each of Graham's eight producers at the time had been issued a copy, and no other Graham employee was in possession of one. These eight copies were very tightly controlled by Margaret Jones ("Jones"), a vice president and the manager of the technical development department at Graham. She testified at trial:

> ... I prepared [the binders containing the Works], with my assistant. Back then we didn't have word processing like we do today. So, we were the ones that prepared—we would go collect—well, first time, we prepared the green binders that we gave to all of our producers, and we're the ones that printed out all the pages. We're the ones that put the copyright notice on the white glossy sheet and we took them around and we gave them to each one of our producers. And then, whenever we would make changes to the standard proposal, we would go collect all eight copies, bring them to our area, we would make all the changes and we would distribute them. We controlled the entire process.

Trial Tr. vol. 1, 156:9–156:22, June 19, 2006 (as corrected by Feb. 13, 2007 Order, Docket Entry 185).

Additionally, Graham emphasized during the trial how important the binders were to it. Graham's president, William Graham, testified that the Works were "absolutely essential" to his company's business and that they were "probably the most important way that we can establish credibility [sic] with a perspective [sic] client." Trial Tr. vol. 2, 55:5–55:20, June 20, 2006. He explained that because the insurance industry is "so confusing," it is the use of the simplified language in the Works that allows Graham to "get in front of hundreds of businesses," that is, establish its competitive edge, and to "tell a customer, we know what we are doing." *Id.* at 55:25–57:12.

Further, it is undisputed that Graham expected Haughey to return the copyright-

ed binders when he left Graham's employ in 1991. At that time, Graham and Haughey negotiated a contractual agreement, dated September 11, 1991, whereby Haughey specifically reaffirmed his obligation under his 1989 employment contract to return all Graham Company books, documents and other property upon his departure. That employment contract stated:

All books, cards, records, accounts, files, notes, memoranda, lists and other papers or the information contained therein or obtained therefrom, connected with or arising from or created in the activities and/or affairs of Employer, in the charge or possession of Employee, is the property of Employer and . . . [a]t the termination of this Agreement . . . *shall be turned over to and delivered to Employer without hesitancy or delay.*

1989 Producer Employment Agreement (emphasis added). Due to the size, significance, and limited number of copies of the Works, Haughey's failure to return his copy would have been obvious, particularly given his reaffirmation of his contractual obligation to return the binders shortly before he left Graham's employ.

Graham now seeks to undermine the suggestion that it knew or should have known that the Works remained in Haughey's possession after his departure for FOG. Graham believes that there is a genuine issue of material fact as to whether Haughey actually retained the binders when he left Graham. Graham argues that "nothing in the record suggests that whatever set of binders was current as of Haughey's September, 1991 departure had in fact 'disappeared' from Haughey's office." Pl.'s Mem. in Opp. at 12. We disagree. Putting aside the irony that Graham specifically argued to the jury that

Haughey had taken the two binders containing the 1991 version of the Works, Graham now ignores Haughey's testimony at trial that he had taken the Works with him and used them:

Q: The binders you received containing the Standard Proposal and the Standard Survey and Analysis contained a copyright notice on the top of the binder, isn't that true?

A: I honestly don't remember the copyright notice on the binders.

Q: And you left the Graham Company in early September of 1991, correct?

A: That's correct.

Q: You held on to those books at your home?

A: I did maintain them there, yes.

Q: And then when you moved to FOG you brought them with you to the office at FOG?

A: I don't believe I ever took them into the office. I work from home mostly.

Q: Okay. So you used them at home?

A: Yes.

Q: After you went to Flanagan O'Hara and Gentry?

A: The proposal book.

Trial Tr. vol. 3, 43:24–44:17, June 21, 2006. In putting forth the possibility that Haughey did not take the binders with him to FOG, Graham is also unable to explain away the indisputable fact that USI was in possession of the binders, the contents of which were typed into USI's computer system in 1994 or 1995.

Moreover, the binders taken by Haughey could not have been, as Graham now posits, some "earlier" version of the Works given to Haughey in 1986, soon after he began working at Graham. Jones testified both during her deposition and in a post-trial declaration[1] that the Works were not

---

1. Attached as Exhibit 8 to its Opposition to Defendant's Motion for Summary Judgment (Docket 176), Graham submits an artfully worded declaration by Jones. As noted above, to the extent that this declaration is inconsistent with Jones' deposition testimony

placed in binders and distributed until 1990:

Q: When you were in the era of the standard paragraphs [until 1990], how were they maintained by individual producers and account managers? In a binder?

A: No. They had individual files.

\* \* \* \* \* \*

Q: Did anybody actually put them in a binder and use them as a binder?

A: (Indicating).

Q: Why not?

A: Because they were in a file and that's the way we gave it to everybody. And the process was as you were preparing your survey by line of coverage you would pull your file and do that coverage and then pull your next file and do that coverage.

Jones Dep. June 24, 2005 at 156:3–157:9. *See also* Jones Decl. ¶ 12. Graham's belated effort to raise doubts as to whether Haughey took the binders containing the 1991 version of the Works are to no avail considering the multitude of evidence that it put forth to the contrary. In sum, there can be no doubt based on the evidence that Graham knew or should have known that a copy of the binders remained in Haughey's possession after he was terminated.

Of course, it is not simply Haughey's possession of the physical binders themselves that gave rise to this copyright infringement action. We agree with Graham that an infringer's mere possession of copyrighted material, without more, is insufficient to amount to a storm warning requiring investigation on the part of the copyright holder. Instead, it is the use or copying of the contents of the binders that

or her testimony at trial, we will disregard it in determining whether there is a genuine issue of material fact. *In re CitX Corp.,* 448 F.3d at 679 (3d Cir.2006). Additionally, to

is critical. Storm warnings, however, existed for Graham in this respect too.

First, unlike most copyrighted works such as art objects or books, Graham did not create the Works at issue here simply to be gazed upon or read. The very purpose of the Works was to copy portions of them into the surveys and analyses and the proposals submitted to its clients. In its memorandum in opposition to defendant's motion for summary judgment, Graham now speculates that the Works could have also been used as a reference guide or a checklist. Graham belatedly attempts to diminish the importance of the Works by adopting Haughey's testimony that he "had really no use for them" as evidence that Graham could have reasonably assumed Haughey would quickly dispose of the binders. The jury clearly found Haughey's testimony not to be credible when it returned a finding of infringement, a finding Graham does not dispute. As described above, there is no doubt that Graham considered the Works to be vital to its business and expected Haughey to return his copy upon his departure. Graham witnesses also testified that the value of the Works consisted in the ability to copy them easily and so disseminate the information they contained to their clients. William Graham testified at trial that it was important to present the clients with a written proposal because

[I]nsurance is so confusing … it is like trying to drink from a fire hose, all the information that [a client has] seen, try to think in terms of remembering all that a month from now, I mean it is impossible. But if you have real short succinct explanations of what was covered and what was explained, [clients]

the extent that Jones' declaration is not based on personal knowledge, we will disregard it under Rule 56(e) of the Federal Rules of Civil Procedure.

say to me they use it as a referral and they look at it and go over it.

Trial Tr. vol. 2, 56:25–57:12, June 20, 2006. Jones also testified that the "added value" the Works provided over the standard paragraphs derived specifically from the efficiency gains in being able to copy the relevant sections from a single document that was "sitting right in front of you" rather than the multiple and disparate files that contained the Standard Paragraphs. Jones Dep. June 24, 2005 at 158:12–159:24.

Second, Graham knew that Haughey had taken a position with FOG, a competing insurance brokerage firm, and was not, for example, going into retirement or another field of endeavor. Graham was aware that Haughey's position at FOG would be a producer, the same position he held at Graham, and understood that among Haughey's responsibilities would be the preparation of written client proposals in his efforts to sell insurance. The 1991 Termination Agreement between Graham and Haughey was negotiated and signed to protect Graham if and when Haughey went to work for a competitor, as he did. In addition, on November 25, 1991, Graham, Haughey and FOG entered into a separate agreement ("November, 1991 Agreement") whereby FOG purchased from Graham certain accounts for which Haughey had been responsible at Graham. As part of that agreement, Graham's files for those six clients were transferred to FOG. The November, 1991 Agreement specifically reflected Graham's concern that Haughey could misuse the Works to secure business:

> All knowledge and information concerning and respecting the activities and/or affairs of Graham and/or its clients (including, without limitation Graham's Survey and Analysis, Proposal, Underwriting Submission, Coverage Checklist, and Claims Loss Formats), which Haughey had acquired during his employment shall be held in trust, in confidence for the sole benefit of Graham, its successor and assigns, and its clients.

November, 1991 Agreement at ¶ 12. This agreement reiterated Haughey's obligation to return all other materials to Graham "without hesitancy or delay" in order to prevent Haughey and FOG from using them in connection with their competing insurance business. As sophisticated insurance professionals, those in management at Graham knew how valuable the binders would be in the hands of a competitor. In a word, the only real benefit of the Works was the ability to copy portions of them into proposals submitted to clients and thus to infringe Graham's copyright.

Graham now attempts to dispute the fact that the two companies were competitors. Graham purports to do so on the ground that Graham had begun to court larger businesses as its primary clientele, while FOG carried a portfolio of smaller, family-run businesses.[2] Graham's assertion in this regard is meritless. Graham and FOG were both commercial insurance brokerage firms. They both provided

---

**2.** Graham also seeks to bolster its contention by proffering a recent declaration of William Graham in which he states that "[At the time Haughey left Graham], I did not consider FOG to be a competitor of The Graham Company." Graham Decl. at ¶ 5. Because this statement is inconsistent with Mr. Graham's deposition testimony, we will disregard it as a sham affidavit in determining whether there is a genuine issue of material fact. *In re CitX*

*Corp.*, 448 F.3d at 679 (3d Cir.2006). During his deposition, Mr. Graham was asked whether he considered USI, FOG's successor corporation, to be a competitor of The Graham Company, Mr. Graham answered "Yes." He went on to add that "We rarely compete with them, but they would be considered a competitor." Graham Dep. July 18, 2005 at 113:24–114:18.

property and casualty insurance services to businesses. It is also telling that Graham actually discovered the infringement in this case when it was attempting to solicit the business of a client who had also received a proposal from USI. This can only be characterized as competition. In any event, Graham was aware that, like it, FOG also employed the use of written proposals to its clients. Regardless of the type of clientele Graham started to pursue, it is clear that the information contained in and the format of the Works would be a useful asset for a producer at FOG and that Graham was aware of that fact.

Finally, there was another piece of evidence, not only that Graham considered Haughey and FOG competitors, but that establishes yet another early storm warning that Graham needed to investigate and monitor Haughey's use of the binders containing the Works. On October 4, 1991, Judith Dooling ("Dooling"), Executive Vice President at Graham, sent a letter to Haughey which accused him of breaching his contractual obligations by continuing to contact Graham's clients after his departure. The letter stated that:

> To confirm our conversation yesterday afternoon, *effective immediately we expect you to stop calling, visiting, or having any other form of contact with our clients.* As I explained to you, this is a violation of your contract.

Letter from Dooling to Haughey (October 4, 1991) (emphasis in original). The letter also reminded Haughey that he must cancel an appointment he had scheduled with one of Graham's clients. The appointment was to take place 23 days after Haughey's departure from Graham. Clearly, in the fall of 1991, Graham was well aware that Haughey was engaging in improper competitive activities and that he had already violated one of his contractual obligations. With this violation, it was surely incumbent upon a sophisticated business such as Graham to investigate the whereabouts of the binders containing Graham's valuable Works and to determine if Haughey was copying those Works into proposals to sell insurance at his new employer.

Graham contends that it was reasonable for it to expect Haughey would abide by the copyright in the Works. Graham argues that Haughey was indisputably aware of Graham's claim to copyright in the Works and had even acknowledged Graham's rights in its proprietary forms in writing. Even if Graham is correct, however, that copyright owners may assume that the public at large will respect copyright notices, the question here is of Graham's reasonableness with respect to one particular individual, whom it already had cause to distrust and who, in Graham's view, had already breached his non-compete agreement. Graham obviously did not deem the copyrights on the Works in and of themselves to be a sufficient deterrent to infringement. Otherwise, it would not have needed to negotiate a reaffirmation of Haughey's obligation to turn over the binders upon his departure and reiterate that obligation in the November, 1991 agreement. Graham's belief that Haughey had breached his Termination Agreement in other respects in October of 1991 adds to the insurmountable evidence that it was unreasonable for Graham not to have made investigation of Haughey's post-termination behavior and to have insisted that he return the missing binders.

In addition to its above-described objections to the factual bases of these suspicious circumstances, Graham suggests that storm warnings may only occur after the actual injury, that is, the infringement, has already happened and not merely as a indicator of a potential infringement. The concern, according to Graham, is that if the presence of pre-injury storm warnings triggers the statute of limitations clock,

the clock would be running on a claim before the injury giving rise to the claim had even occurred. Graham is correct that in the present instance, the circumstances this court has identified as giving rise to a duty to investigate arose upon his departure from Graham in the fall of 1991, before the first evidence of an infringing proposal prepared by Haughey in July, 1992. Graham is also correct that it would be nonsensical for a statute of limitations to begin running before the actual injury had occurred. However, we see no reason why the clock on Graham's claims should not have started to run at the time when Haughey first began to infringe, since there is no sign that any of the storm warnings had abated by that point.

Graham is incorrect in its contention that storm warnings must warn of an actual injury that has already taken place. The storm warning standard is designed to encourage potential plaintiffs to be reasonably diligent in investigating suspicious circumstances so that they discover their injuries in a timely fashion. Surely, if a copyright owner has warnings or is in possession of suspicious circumstances, *see* *Mathews,* 260 F.3d at 252, that a person is about to infringe a copyright in the near future, the copyright owner cannot sit on his hands and argue years later that the statute of limitations had not started to run because infringement had not yet occurred when the storm warnings first appeared. Under Graham's argument, Haughey could have told Graham on day one that he was anticipating infringing on day two, and because he was not infringing on day one, the statute of limitations would have been tolled for years without the need for any further action on the part of Graham. This would expand the discovery rule beyond recognition and totally undermine the purpose of the statute of limitations to preclude stale claims and prevent parties from sleeping on their rights. *Crown,* 462 U.S. at 356, 103 S.Ct. 2392. A

copyright owner has the duty to investigate indications that infringement is in the offing, even if, in the course of the investigation, it learns that infringement has not yet occurred. *See generally Benak,* 435 F.3d at 400–01; *Mathews,* 260 F.3d at 251–52.

The cases Graham cites in its motion for summary judgment are all inapposite. First, Graham cites *MacLean Assoc., Inc., v. WM. M. Mercer–Meidinger–Hansen, Inc.,* for the proposition that just because a would-be infringer possesses a copy of a work, it does not follow that the copyright owner should know the infringer will infringe. 952 F.2d 769 (3d Cir.1991). In *MacLean,* the copyright owner was a former employee of the defendant infringer. After leaving the defendant's employ to start his own company, the owner created a software program designed to help one of his former employer's clients, for whom he was still providing professional services as a consultant. On two occasions in 1986, the owner gave his former employer copies of the software program without any restrictions on their use so that it could do additional work on the client's account. The defendant began infringing the owner's copyright in 1987, the owner had actual notice that his copyright was being infringed in 1989, and he filed suit for copyright infringement approximately one year later. Even though all infringing acts were indisputably within the statute of limitations, the defendant argued that the owner's claim should be barred by laches, and the District Court agreed. The Court of Appeals, however, reversed on the grounds that the circumstances did not warrant application of laches, an equitable doctrine, particularly since the suit was otherwise within the statute of limitations. *Id.* at 780. It found that an assumption that possession of a work would necessarily lead to infringement would impose on copyright owners "a never ending

obligation to discover whether anyone to whom he ever supplied his software would copy it." *Id.* In contrast, Graham had significantly more information and significantly more reasons to suspect infringement than Haughey's mere possession of the binders. In addition, it is significant that the issue in *MacLean* was whether the equitable doctrine of laches could be applied. In that context, it is hardly surprising that the Court of Appeals was hesitant to impose a higher standard on the owner that would deprive him of his statutory right to a minimum limitations period.

Next, Graham cites *Jacobsen v. Deseret Book Co.*, 287 F.3d 936 (10th Cir.2002), which also concerned laches. In *Jacobsen,* the author of a book lent it to another author, who claimed he wanted to use it for "gathering background information" for writing a book on the same subject. *Id.* at 949. The Court of Appeals for the Tenth Circuit held that the District Court's grant of summary judgment was inappropriate because that court had made factual findings as to admittedly "highly disputed" matters. *Id.* Among the disputed issues of fact was the question of whether the copyright owner had any reason to suspect that the defendant was using the owner's book in an inappropriate way. *Id.* at 950. The Court of Appeals noted that the copyright owner was "expected to exercise reasonable diligence in protecting his rights." *Id.* (internal quotations and citation omitted). The court also recognized that the suit was brought within the three-year statute of limitations and the application of laches would serve to shorten that statutory minimum period. *Id.* at 951. The present matter is clearly distinguishable, first on the ground that the issue before us is the statute of limitations, rather than laches, and second because there are no disputes of material fact as to the warning signs which gave rise to Graham's duty to investigate.

Graham then cites to *Lennon v. Seaman,* 63 F.Supp.2d 428 (S.D.N.Y.1999). There, Yoko Ono Lennon sued a former employee, a photographer, under the Copyright Act for removing Lennon family photographs from her house and disseminating them nearly two decades later. Lennon brought suit within three years of the alleged infringement. The defendant photographer tried to characterize Lennon's claim as one seeking to vindicate a property right in the photographs themselves, rather than a copyright infringement claim based on the improper reproduction of the photos. *Id.* at 444. Thus, he argued, "the statute of limitations should begin to run at the time the plaintiff knew that the defendant had the Photographs." *Id.* Unsurprisingly, the *Lennon* court refused to accept the defendant's characterization and concluded that the date that Lennon knew the defendant possessed the photographs was irrelevant to the accrual of the claim and did not trigger the statute of limitations. Because the action was clearly brought within three years of the infringement, the *Lennon* court did not have occasion to consider the discovery rule. Graham's reliance on this case for the proposition that mere possession of a copyrighted work by another party should lead a defendant to conclude that the copyright was being infringed is misplaced, as that issue was not before the court.

Finally, Graham relies on *In re Indep. Serv. Orgs. Antitrust Litig.*, 114 F.Supp.2d 1070 (D.Kan.2000). In that case, copyright owner Xerox contended that the defendant CCS had infringed Xerox's copyright in certain service manuals. CCS was in the business of servicing and maintaining Xerox copiers, and Xerox had previously sold the manuals to CCS, although CCS was not authorized to copy them. Xerox stopped supplying the manuals in 1989.

Thereafter, CCS made some number of copies of manuals, although it was unclear which manuals or how they had been obtained and how many copies had been made. The court applied the discovery rule and granted summary judgment for Xerox, over CCS's argument that Xerox's claims should have accrued in 1989 because Xerox should have known that by ceasing to sell its manuals to CCS, CCS would have to copy the service manuals to stay in business. The court found that the fact that CCS remained in business after Xerox stopped selling it the manuals did not constitute suspicious circumstances giving rise to a duty to investigate by Xerox. Here, by contrast, there were additional and specific suspicious circumstances regarding Haughey's use of the binders in issue.

We reiterate and agree with Graham that mere possession by a person of a copyrighted work without more does not ordinarily place any burden on a copyright owner to investigate possible infringement. That, however, is not the case before us. Here, the storm warnings or suspicious circumstances about possible infringement were compelling long before February 9, 2002, but Graham ignored them. The Works were contained in two voluminous binders. Only eight sets of these binders existed at Graham, and a Graham vice president tightly controlled their distribution. The Works were an extremely valuable business tool that Graham expected its producers, such as Haughey, to use to sell insurance. The very purpose of the Works was for producers to copy the relevant portions of them into client proposals and surveys and analyses. In fact, the Works were put into binders specifically to increase the ease with which they could be copied. To protect the competitive advantage the Works provided, Graham negotiated multiple contractual agreements with Haughey which obligated him to return the Works upon his departure from Graham. When Haughey's employment with Graham was terminated in 1991, Haughey did not return the binders and Graham never inquired about their whereabouts. Because of their size, their limited number, and their value, the absence of a copy should have been easily noticed. Graham was well aware that Haughey would be working for FOG, a competing insurance brokerage firm, and would have the same job responsibilities there as he did at Graham. As noted, the only real use Haughey would have for the Works was to copy them in violation of Graham's copyright. Graham also believed that Haughey was not a person of his word, for Graham considered him in violation of his contractual obligations by continuing to contact Graham clients after his employment there had been terminated. A person who had breached an agreement with Graham in this regard is likely to infringe the copyright on its Works.

Clearly, Graham, a sophisticated party, had information upon Haughey's departure that would cause a person, in the exercise of reasonable diligence, to inquire of Haughey and FOG about the possession, use and copying of the information contained in the binders and even to demand their immediate return before any damage to Graham occurred. Instead, Graham ignored the obvious "storm warnings" or "suspicious circumstances" and made no investigation at all. *Benak*, 435 F.3d at 400–01. The Court of Appeals has instructed that, "[I]f storm warnings existed, and the [plaintiff] chose not to investigate, we will deem [it] on inquiry notice of [its] claims." *Benak*, 435 F.3d at 400–01 (citations omitted). Graham's total failure to pursue the existent storm warnings was unreasonable as a matter of law and precludes it from reaping the tolling benefits of the discovery rule. The three year statute of limitations set forth in the Copyright Act bars all of Graham's claims

against defendants that accrued prior to February 9, 2002. Graham, of course, will still be able to recover defendants' profits arising from acts of infringement occurring on or after that date. 17 U.S.C. § 504.

Accordingly, the motion of the defendants for partial summary judgment will be granted. The damages Graham is entitled to recover after February 9, 2002 cannot be resolved on the record before us and must be decided at a new trial.

## IV.

Graham has field a limited motion for reconsideration of our Order of November 21, 2006, which granted a new trial on the issue of the statute of limitations. That motion requested that the court's Order be amended to reflect that, in the event that a jury in the new trial were to determine the statute of limitations issue in Graham's favor, the amount of the first jury's determination of infringer profits as to defendants shall remain in effect and shall be entered in judgment in favor of Graham and against defendants. Because the issue of the statute of limitations has been decided on summary judgment against Graham, its motion for reconsideration will be denied.

Plaintiff's pending motions for summary judgment and to vacate paragraph two of the court's November 21, 2006 Order, which granted defendants' motion for a new trial on the issue of statute of limitations, will also be denied.

## ORDER

AND NOW, this 29th day of March, 2007, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the motion of defendants Thomas P. Haughey and USI Midatlantic, Inc. for partial summary judgment as a matter of law is GRANTED;

(2) judgment is entered in favor of defendants Thomas P. Haughey and USI Midatlantic, Inc. and against plaintiff William A. Graham Company with respect to plaintiff's claim for damages arising prior to February 9, 2002;

(3) the motion of plaintiff William A. Graham Company for summary judgment is DENIED;

(4) the motion of plaintiff for reconsideration of the court's November 21, 2006 Order is DENIED; and

(5) the motion of plaintiff to vacate pursuant to Rule 60 of the Federal Rules of Civil Procedure is DENIED.