

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-5-2009

# William A Graham Com v. Thomas Haughey

Precedential or Non-Precedential: Precedential

Docket No. 08-2007

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"William A Graham Com v. Thomas Haughey" (2009). *2009 Decisions.* Paper 1105.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1105

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 08-2007

———

WILLIAM A. GRAHAM COMPANY,
d/b/a The Graham Company,
                                        Appellant

v.

THOMAS P. HAUGHEY; USI MIDATLANTIC, INC.

———

No. 08-2111

———

WILLIAM A. GRAHAM COMPANY,
d/b/a The Graham Company

v.

THOMAS P. HAUGHEY; USI MIDATLANTIC, INC.,
                                        Appellant

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 05-cv-00612)
District Judge: Honorable Harvey Bartle, III

———

Argued March 3, 2009

Before: SCIRICA, Chief Judge, SLOVITER, and HARDIMAN,
Circuit Judges

(Filed: June 5, 2009 )

_____

Aleksander J. Goranin
Matthew A. Pearson
David J. Wolfsohn   (Argued)
Woodcock Washburn
Philadelphia, PA 19104

      Attorneys for Appellant in No. 08-2007
      Appellee in No. 08-2111

Floyd Abrams   (Argued)
Katherine Vogele
Cahill, Gordon & Reindel
New York, NY 10005

Thomas E. Zemaitis
Pepper Hamilton
Philadelphia, PA 19103

      Attorneys for Appellee in No. 08-2007
      Appellant in No. 08-2111

Jason R. Heller
Cahill, Gordon & Reindel
New York, NY 10005

Matthew R. Skolnik
Bazelon, Less & Feldman
Philadelphia, PA 19102

      Attorneys for Appellant in No. 08-2111

_____

OPINION OF THE COURT

_____

SLOVITER, <u>Circuit Judge</u>.

We face an issue of first impression for this court–whether the discovery rule or the injury rule governs the accrual of claims under the Copyright Act, which has a three-year statute of limitations for civil actions, 17 U.S.C. § 507(b).

Under the injury rule, a claim accrues, and the statute of limitations begins to run, when the plaintiff suffers a legally cognizable injury. Therefore, if the injury rule applies in this case, appellant/cross-appellee William A. Graham Company ("Graham") cannot recover on its claims that appellees/cross-appellants USI MidAtlantic, Inc. and Thomas P. Haughey (collectively, "USI") infringed its copyrights more than three years before Graham filed suit. Conversely, if the discovery rule applies, then Graham's cause of action for each act of infringement did not accrue until Graham discovered, or with reasonable diligence should have discovered, the injury underlying its claim. Thus, if the discovery rule applies, Graham may be able to recover on acts of infringement that occurred more than three years before it filed suit.

The District Court concluded that the discovery rule applied to civil actions under the Copyright Act and the case proceeded to a jury trial. The jury found that Graham was not on notice of USI's infringement prior to February 9, 2002–leading to its conclusion that none of Graham's infringement claims was time-barred. That jury entered a verdict in Graham's favor in the amount of $16,561,230 against USI MidAtlantic and $2,297,397 against Haughey. However, the District Court set aside the jury's finding and ultimately held that Graham was time-barred from recovering for acts of infringement that occurred more than three years before it filed suit in light of certain "storm warnings" of those earlier acts of infringement.

The case then proceeded to a second jury trial on the issue of damages for the three year period preceding Graham's filing; the second jury entered a verdict for Graham in the amount of $1.4 million against USI MidAtlantic and $268,000 against Haughey. Thus, if we determine that the District Court correctly

3

held that the discovery rule governs the accrual of claims under the Copyright Act, we must then decide whether the Court correctly applied that rule to the facts of this case.

Finally, USI cross-appeals and renews its contention, rejected by the District Court, that Graham cannot recover on any of its claims because it failed to prove a legally sufficient causal nexus between the infringement and USI's profits awarded to Graham as compensation for the infringement.

## I.

## BACKGROUND

### A. Facts

Graham is an insurance brokerage firm that provides property and casualty insurance services to businesses. Haughey worked for Graham as a producer (salesperson) from January 1985 through September 1991. Producers serve as intermediaries between their clients and insurance companies. Graham's producers solicit clients by first preparing a risk assessment study, called a survey and analysis, that evaluates the client's needs. In order to prepare the survey and analysis, a producer generally must spend a significant amount of time learning the client's business, assessing its insurance needs, and reviewing its current policies. The producer then prepares a written proposal that contains recommendations addressing the client's needs as identified in the survey and analysis. If the client agrees to Graham's proposal, it places the client with an insurance company that actually writes the insurance. Graham receives a commission from the insurance company which issues the policy and in addition receives a service fee from its client.

In the 1980s, Graham's president, William Graham, developed form language called the Standard Paragraphs to be used by Graham's producers to prepare survey and analysis documents and coverage proposals. The Standard Paragraphs were not copyrighted.

4

Sometime in 1990, Graham began to prepare the Standard Survey and Analysis and the Standard Proposal (collectively, the "Standard Works" or the "Works"). The Standard Works, which were each hundreds of pages long, included some language from the Standard Paragraphs as well as new material. After draft versions of the Standard Works were distributed to Graham's eight producers, including Haughey, the first edition of the Standard Survey was completed around March or April 1991 and it was then copyrighted. The first edition of the Standard Proposal was completed in the fall of 1991 and it also was copyrighted. Graham placed copyright notices on client documents that incorporated the Standard Works and registered certain portions of the Works with the Copyright Office.

Graham's producers use the Standard Works as templates for client-specific proposals. The Standard Works include plain English explanations of insurance policies and concepts that Graham's producers can copy into client-specific materials and that clients can easily understand. The Standard Works also serve as reference materials to guide Graham's producers in the development of client-specific materials. Graham's president testified that the Standard Works are "absolutely essential" to Graham's business "[b]ecause they are probably the most important way that we can establish creditability [sic] with a perspective [sic] client." App. at 371.

Haughey's employment with Graham was terminated in September 1991, apparently because Haughey's clients were primarily smaller, family-run businesses and Graham sought at that time to attract larger businesses as clients. Haughey testified at trial that he left Graham on amicable terms and he received a thirty-thousand dollar severance package payable over three months. Graham and Haughey also entered into a termination agreement in which Haughey reaffirmed his promise in his employment contract to keep company information confidential and to turn over all of Graham's "papers and the information contained therein" in Haughey's possession upon termination of his employment. App. at 1987. Nonetheless, following his termination Haughey retained binders that contained at least part of the Standard Works.

5

Shortly thereafter, Haughey got a job at a smaller insurance brokerage firm, Flanigan, O'Hara & Gentry ("FOG"). At about the same time that Haughey joined FOG, Haughey solicited certain of Graham's clients in violation of his termination agreement. Graham's executive vice president (Judith Dooling) sent Haughey a letter memorializing a conversation in which Haughey agreed to cease such solicitation pending negotiation of an agreement to sell FOG and Haughey certain accounts.[1]

In November 1991, Graham, FOG and Haughey entered into an agreement in which Graham sold FOG six of Haughey's prior accounts. Graham provided FOG and Haughey with materials related to those six accounts, including proposals made to those clients in the current and prior year which included Graham's copyrighted materials. Haughey also specifically promised to hold all "knowledge and information concerning" the Standard Works "in trust [and] in confidence for the sole benefit of Graham," to return all "papers and information" obtained from Graham other than information related to the accounts sold, app. at 2084, and not to "use, divulge, or otherwise disclose" any of Graham's confidential information, app. at 2082.

Notwithstanding his promise, Haughey subsequently infringed Graham's copyrighted material in the Standard Works by including it in proposals to FOG's clients. Haughey first included Graham's copyrighted material in a proposal to a client in July 1992.[2] It is unclear whether Haughey copied this

---

[1] This letter was not presented in evidence before the first jury, which, as previously stated, concluded that Graham was not time-barred from recovering for acts of infringement occurring more than three years prior to Graham's filing of the instant case. However, the District Court relied in part on Haughey's improper solicitation of Graham's clients as evidence that Graham was on notice of USI's copyright infringement as early as the fall of 1991.

[2] USI contends that Haughey's testimony supports an inference that his infringement began immediately after his arrival

6

material from his own copy of the Standard Works or whether he used a copy of the 1992 version of the Standard Works (which Haughey had not obtained before the termination of his employment with Graham) brought to FOG by another former Graham employee, Don Boresen, in the spring of 1992. In any event, at some time in 1994 or 1995, FOG copied the entire 1992 version of the Standard Works into its word processing system; paper copies were also distributed to FOG's employees.

In 1995, FOG was acquired by USI Holdings and subsequently merged with two other entities to form USI MidAtlantic. The Standard Works were made available to USI employees.

According to Graham's expert, Haughey and USI copied Graham's copyrighted language from the Standard Works into at least 857 proposals over thirteen years (1992 through 2005). USI personnel testified that its written proposals to clients (including, presumably, those with infringing language) were an important part of the sales process–in fact, Haughey even testified that some clients were convinced to purchase insurance through USI on the basis of the proposals–and that it was USI's practice to review the proposal's contents "page by page" with the client. App. at 571. Moreover, FOG had nothing comparable to the Standard Works when Haughey first arrived

---

at FOG in November 1991, but the portions of his testimony relied upon by USI do not establish a date of infringement. USI also notes that, during opening arguments to the jury, Graham made statements that USI's improper use of the Standard Works began in 1991, and contends that Graham should be held to these statements. However, this court has held that a "judicial admission[ ] must be unequivocal" to be effective, *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972), and Graham's statements do not unequivocally state that an act of infringement (as opposed to possession of the Works) occurred in 1991. Moreover, Graham had the burden to prove that acts of infringement occurred, and its evidence established a date of first infringement in July 1992.

and, as noted above, FOG and USI made electronic and paper copies of the Standard Works available to their employees and encouraged them to use the Standard Works when developing client-specific materials. On the other hand, most of USI's proposals during this period did not include infringing language, and even those that did include infringing language did so only on a few pages.

It was USI's practice to keep proposals to clients confidential, and Graham did not discover USI's infringement until November 2004, when a client showed one of Graham's producers a copy of a USI proposal to the client.

## B. Procedural History

Graham filed this action on February 8, 2005, asserting claims for copyright infringement against USI and Haughey as well as a breach of contract claim against Haughey. USI moved for partial summary judgment, contending that any infringement that occurred more than three years prior to filing of the complaint was time-barred under the Copyright Act's three-year statute of limitations for civil actions. The District Court denied the motion, holding that the discovery rule applied to infringement claims under the Copyright Act and that therefore Graham was entitled to present evidence to demonstrate that it could not have reasonably discovered USI's infringement before it actually did so.[3]

The case proceeded to a jury trial.[4] After Graham voluntarily dismissed the breach of contract claim that it had asserted against Haughey, the jury reached a verdict in favor of

---

[3] The District Judge who initially heard this matter and who ruled on the statute of limitations motion died in 2005. The successor District Judge reaffirmed that ruling.

[4] We note that the District Court provided the jury with a spoliation instruction because USI destroyed certain client proposals after the Court had ordered production of such documents.

Graham on the copyright claim in the amount of $16,561,230 against USI and $2,297,397 against Haughey.[5] The District Court presented the jury with several interrogatories, including, as relevant here, whether Graham should have discovered that USI was infringing its copyrights prior to February 9, 2002. Because the jury answered in the negative, Graham's claims were not time-barred under the discovery rule.

Following the jury verdict, USI moved for a new trial on the statute of limitations issue, and the District Court granted the motion. According to the Court, the jury's answer to the statute of limitations interrogatory "was against the great weight of the evidence" because the District Court concluded that Graham knew or should have known of certain storm warnings that Haughey would infringe as early as the fall of 1991.[6] *William A.*

---

[5] This amount represented the profits that USI and Haughey earned as a result of the infringement. Under the Copyright Act, 17 U.S.C. § 504(b), Graham bore the burden of establishing the defendants' gross revenue from infringement; Graham presented evidence that USI's gross commissions from clients who received an infringing proposal were approximately $32 million and that Haughey's gross commissions were approximately $12 million. The defendants then bore the burden of proving that certain expenses should be subtracted from the gross revenue figure and to apportion the revenues between their infringing and non-infringing conduct. *Id.* Here, the evidence showed that twenty-five percent of the gross revenue was paid to producers as a salary expense, leaving a total net commission for the defendants of approximately $27 million. The jury's ultimate award was approximately seventy percent of that net commission, implying that the jury concluded that thirty percent of the net commission was attributable to factors other than the infringement.

[6] In reaching this conclusion, the District Court considered evidence regarding Haughey's obligations to Graham under his employment and termination contracts even though the Court excluded those contracts from the jury because it had held that those contracts were superseded by the November 1991 agreement between Graham, FOG and Haughey.

*Graham Co. v. Haughey*, No. 05-612, 2006 WL 3386672, at *15 (E.D. Pa. Nov. 21, 2006). Specifically, the Court concluded that Graham should have known: that Haughey retained a copy of the Standard Works in violation of his employment and termination agreements with Graham as well as the November 1991 agreement that sold FOG certain of Haughey's client accounts; that he was working as a producer for another insurance brokerage firm; and that, given these facts, "it was quite possible, if not likely, that Haughey and FOG would copy [the Standard Works] into client proposals, for that was the only reason for Haughey and FOG to retain [them]." *Id.* at *14. Thus, the District Court concluded that "Graham had information upon Haughey's departure [in the fall of 1991] that would cause a person, in the exercise of reasonable diligence, to inquire of Haughey and FOG about the possession, use and copying of the [Standard Works]." *Id.* Therefore, the District Court ordered a new trial as to the application of the Copyright Act's statute of limitations and the calculation of Graham's damages.

Because the District Court granted USI's motion for a new trial on the statute of limitations issue, it did not reach USI's motion for a new trial on the grounds that the jury's apportionment of USI's profits (i.e., whether the profits were attributable to infringement or some other non-infringing cause) was against the weight of the evidence and/or that the verdict was excessive.

USI also moved for judgment as a matter of law on the ground that Graham failed to prove a legally sufficient causal connection between any copyright infringement and USI's profits. The District Court denied that motion, holding that Graham met its burden on this issue because Graham sought to recover USI's profits only as to USI's clients who received infringing proposals, demonstrated that the written proposals were an important part of USI's sales process, and demonstrated that USI pervasively used language from the Standard Works.

Following subsequent cross-motions for summary judgment on the statute of limitations issue, the District Court

10

held that as a matter of law Graham could not recover on any acts of infringement that occurred prior to February 9, 2002. *William A. Graham Co. v. Haughey*, 484 F. Supp. 2d 324, 336-37 (E.D. Pa. 2007). The Court concluded that sufficient storm warnings existed to put Graham on notice of Haughey's (and thus USI's) infringement in the fall of 1991, i.e., shortly after Haughey left Graham. The Court noted that Graham was or should have been aware: that Haughey retained possession of a copy of the Standard Works when he left Graham; that the only value of the Standard Works to Haughey was to copy them into client proposals; that Haughey went to work for a competing insurance broker; and that Haughey was "not a person of his word" because he engaged in improper competitive behavior by violating the non-compete clause of his employment and termination contracts. *Id.* at 336.

The District Court rejected Graham's argument that "the circumstances this court has identified" as storm warnings could not have put Graham on notice of the defendants' infringement because those storm warnings were related to Haughey's "departure from Graham in the fall of 1991, before the first evidence of an infringing proposal prepared by Haughey in July, 1992." *Id.* at 334. The Court conceded that "it would be nonsensical for a statute of limitations to begin running before the actual injury had occurred," but concluded that "we see no reason why the clock on Graham's claims should not have started to run at the time when Haughey first began to infringe, since there is no sign that any of the storm warnings had abated by that point." *Id*.

The case proceeded to a second jury trial on the issue of damages for acts of infringement occurring on or after February 8, 2002. The jury again returned a verdict for Graham, this time in the amount of $1.4 million against USI and $268,000 against Haughey. Graham timely appealed on April 2, 2008 and USI timely cross-appealed on April 15, 2008.[7]

---

[7] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). This court has jurisdiction under 28 U.S.C.

## DISCUSSION

### A. Statute of Limitations

The Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). Because Graham filed this action on February 8, 2005, the accrual of Graham's claims must be evaluated as of February 9, 2002. However, in continuing infringement cases such as this, "[e]ach act of infringement is a distinct harm giving rise to an independent claim for relief." *Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir. 1992) (citing *Mount v. Book-of-the-Month Club, Inc.*, 555 F.2d 1108 (2d Cir. 1977)). Thus, as the District Court correctly held, Graham was not time-barred from recovering for any acts of infringement that occurred on or after February 9, 2002, regardless of whether the injury or discovery rule applies to determine the accrual of claims under the Copyright Act. That is not in dispute. Instead, the parties differ on whether Graham may also recover for any acts of infringement that occurred prior to February 9, 2002.

### 1. Claim Accrual Rule

The question of whether the discovery rule or the injury rule applies to determine when a civil cause of action accrues under the Copyright Act is a legal one. Under the discovery rule, a "cause of action accrues 'when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.'" *Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 539 F.3d 199, 209 (3d Cir. 2008) (quoting *Romero v. Allstate Corp.*, 404 F.3d 212, 222 (3d Cir. 2005)). Under the injury rule, a cause of action accrues at the time of the injury. In this case, if the injury rule were to apply, Graham would be time barred from recovery on any acts of

---

§ 1291.

infringement that occurred prior to February 9, 2002.

Although we have not previously addressed this issue, eight of our sister courts of appeals have applied the discovery rule to civil actions under the Copyright Act. *See Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 44-46 (1st Cir. 2008); *Comcast v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 944 (8th Cir. 2007); *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 390 (6th Cir. 2007); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 705-07 (9th Cir. 2004); *Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 796 (4th Cir. 2001); *Daboub v. Gibbons*, 42 F.3d 285, 291 (5th Cir. 1995); *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992).

USI contends that these precedents are not persuasive because the question of whether the injury or discovery rule applied was not squarely raised in most of them and, more importantly, they fail to address the Supreme Court's decision in *TRW Inc. v. Andrews*, 534 U.S. 19 (2001).

The *TRW* case did not arise under the Copyright Act but under the Fair Credit Reporting Act ("FCRA"). In reaching the statute of limitations issue, the Ninth Circuit held that, because Congress had not "'expressly legislated otherwise,'" the discovery rule applied to claims under the FCRA. *Id.* at 26 (quoting *Andrews v. TRW Inc.*, 225 F.3d 1063, 1067 (9th Cir. 2000)). The Supreme Court rejected that approach and held that the discovery rule did not apply to actions under the FCRA because "the text and structure of [the FCRA] evince Congress' intent to preclude judicial implication of a discovery rule." *Id.* at 28. Specifically, the Court reasoned that because the FCRA provided that the "statute of limitations runs from 'the date on which the liability arises,' subject to a single [statutory] exception for cases involving a defendant's willful misrepresentation of material information," the "most natural reading of [the FCRA] is that Congress implicitly excluded a general discovery rule by explicitly including a more limited one." *Id.* (quoting 15 U.S.C. § 1681p).

13

This court had the occasion to interpret and apply *TRW* when it was faced with the issue of the statute of limitations applicable to the Americans with Disabilities Act and the Rehabilitation Act. *Disabled in Action*, 539 F.3d at 208-09. Because neither act included an express statute of limitations, we applied the two-year state statute of limitations. *Id.* at 208. In reaching the "more difficult question" of when the two year statute begins to run, *id.*, we interpreted *TRW* to require the following inquiry to determine the applicable accrual rule for federal causes of action. First, "[w]here Congress has specified an accrual date by 'explicit command' or 'by implication from the structure and text of the statute,' we defer to its directive." *Id.* at 209 (quoting *TRW*, 534 U.S. at 27-28). Second, "'[i]n the absence of a contrary directive from Congress,' we apply the 'federal discovery rule.'" *Id.* (quoting *Romero*, 404 F.3d at 222).

USI would have us set aside that analysis, applied by this court less than a year ago, in favor of a single district court decision in another circuit which used the injury rule to determine when claims accrue under the Copyright Act. *See Auscape Int'l v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 235, 247 (S.D.N.Y. 2004). We decline to do so. Even the court in *Auscape* conceded that "the text and structure of the [Copyright Act] lend no guidance" as to "Congress' intent with regard to when an infringement claim accrues." *Id.* at 244. This concession answers in the negative the first question raised in *Disabled in Action*: whether "Congress has specified an accrual date by 'explicit command' or 'by implication from the structure and text of the statute.'" 539 F.3d at 209 (quoting *TRW*, 534 U.S. at 27-28).

Further, the text and structure of the Copyright Act actually favor use of the discovery rule. As noted by Graham, *criminal* actions under the Copyright Act must be "commenced within 5 years after the *cause of action arose*." 17 U.S.C. § 507(a) (emphasis added). Just six years prior to the amendment to the Copyright Act that added the civil limitations period now codified at 17 U.S.C. § 507(b), the Supreme Court interpreted language similar to § 507(a)'s criminal limitations period in the Admiralty Act ("cause of action arises") to embody the injury

14

rule. *McMahon v. United States*, 342 U.S. 25-26, 27 (1951); *see also TRW*, 534 U.S. at 32 (noting that petitioner "offer[ed] a strong argument" that use of the word "arise" in a statute of limitations provision signals congressional intent to adopt the injury rule (citing *McMahon, 342 U.S. 25*)). Significantly, Congress used different language in the *civil* limitations provision ("after the claim accrued"), which the Supreme Court had previously interpreted as embodying the discovery rule. *See Urie v. Thompson*, 337 U.S. 163, 169-170 (1949) (construing "cause of action accrued" in Federal Employers' Liability Act and holding that statute of limitations was not triggered until injured employee should have known of injury). Given the maxim of statutory construction that "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (quotation omitted), Graham persuasively argues that the criminal and civil limitations periods embody different claim accrual rules and that § 507(b) should be interpreted to embody the discovery rule.

USI, once again pointing to *Auscape*, interprets the legislative history of the Copyright Act's statute of limitations provision as evidence of congressional intent to adopt the injury rule for civil claims brought pursuant to the Copyright Act. However, Congress provided no "directive" mandating use of the injury rule in that legislative history. *Disabled in Action*, 539 F.3d at 209.

For example, until the statute of limitations provision now codified at 17 U.S.C. § 507(b) was enacted in 1957, the Copyright Act lacked a statute of limitations period for civil actions and courts borrowed state statutes of limitation for analogous claims. *See* S. Rep. No. 85-1014 (1957), *as reprinted in* 1957 U.S.C.C.A.N. 1961, 1961-62. USI notes several instances in the legislative history of § 507(b) in which congresspersons and witnesses argued that § 507(b) was necessary to provide a "uniform" or "fixed" limitations period. However, these statements reflected dissatisfaction with the use of state statutes of limitations, which ranged from one to eight

15

years and therefore encouraged forum-shopping. *See id.* at 1962; *see also Copyrights–Statute of Limitations: Hearing on H.R. 781 Before H. Comm. on the Judiciary*, 84th Cong. 9, 35, 40 (1955) (hereafter "Hearing"). None of these statements addressed the separate issue of when a claim would accrue under the new federal three-year statute of limitations.

USI also relies on a statement in the Senate Report that "due to the nature of publication of works of art . . . generally the person injured receives reasonably prompt notice or can easily ascertain any infringement of his rights. The committee agrees that 3 years is an appropriate period for a uniform statute of limitations for civil copyright actions and that it would provide an adequate opportunity for the injured party to commence his action." S. Rep. No. 85-1014 (1957), *as reprinted in* 1957 U.S.C.C.A.N. 1961, 1962. Again, this statement does not speak directly to the accrual of actions, but rather seeks to support the three-year limitations period adopted by Congress. Moreover, the fact that Congress believed that infringement was "generally" a public act does not necessarily imply that, in cases in which infringement was not public, Congress intended to reject application of the discovery rule. Indeed, the quoted passage speaks of whether the injured party has "reasonably prompt notice" of infringement–an inquiry consistent with the discovery rule.

USI next points to what we view as an unenlightening exchange between Representative Shepard J. Crumpacker and a lobbyist for the motion picture industry during a House committee hearing. Representative Crumpacker was concerned that a movie company could make a movie that infringed on a writer's script, secretly show that movie in a small town, sit on the movie until the statute of limitations passed, and then release the movie generally while claiming that the writer was barred from enforcing his or her rights. Hearing at 47. The lobbyist responded that each performance of the film would constitute a separate act of infringement. *Id.* at 48. This exchange is not illustrative of Congressional intent regarding when copyright claims accrue, but is cited by USI because the lobbyist also stated that "if [an act of infringement] occurred three years ago .

16

. . [, then it] would be barred in three years." *Id.* That single statement by a witness at a congressional hearing, which no congressperson commented on or agreed with, signifies nothing and is hardly a basis to conclude that Congress intended to apply the injury rule.

USI also notes that Congress considered including certain express provisions to permit tolling of the statute of limitations, including where the infringer was guilty of fraudulent concealment, and it argues that the consideration of these exceptions would have been unnecessary had Congress intended to apply the discovery rule to claims under the Copyright Act. Of course, had Congress included those limited exceptions within § 507(b), the holding in *TRW* might well have inclined us to reject the discovery rule here. But the important fact is that Congress rejected inclusion of any statutory exceptions to the statute of limitations period, and did so because "the Federal district courts, generally, would recognize these equitable defenses anyway." H. Rep. No. 84-2419, at 2 (1956).

Moreover, the legislative history makes clear that Congress intended the Copyright Act's statute of limitations to apply "to the remedy of the person affected thereby, and not to his substantive rights," *id.,* by which Congress meant that "[e]quitable considerations are available to prolong the time for bringing suit," *id.* at 3. Further, Congress feared that inclusion of specific statutory exceptions to the three-year limitations period "might result in unfairness to some persons." S. Rep. No. 85-1014 (1957), *as reprinted in* 1957 U.S.C.C.A.N. 1961, 1963. Thus, this case actually presents the opposite situation as *TRW*: Congress considered, but rejected, inclusion of specific statutory exceptions to the Copyright Act's statute of limitations in order to ensure that the courts could consider any equitable circumstances sufficient to excuse a plaintiff's failure to sue within the three-year limitations period.[8]

_____

[8] USI correctly notes that the legislative history regarding the rejected statutory exceptions to the Copyright Act's three-year limitations period was directed toward equitable tolling rather than

17

Finally, USI argues that use of the discovery rule would be inappropriate as a matter of policy. USI notes that in *TRW* the Supreme Court stated that it has "recognized a prevailing discovery rule . . . in two contexts, latent disease and medical malpractice, 'where the cry for such a rule is loudest.'" *TRW*, 534 U.S. at 27 (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). USI would distinguish copyright infringement, arguing that "there is nothing intrinsically 'hidden' or 'latent' about copyright infringement because it is by its nature a public act that is only very rarely hidden from the copyright owner." USI's Reply Br. at 16. That may be true in some instances but not in all. Technological advances such as personal computing and the internet have "ma[de] it more difficult for rights holders to stridently police and protect their copyrights." John Ramirez, Note, *Discovering Injury? The Confused State of the Statute of Limitations for Federal Copyright Infringement*, 17 Fordham Intell. Prop. Media & Ent. L.J. 1125, 1158 (2007) (concluding that discovery rule is appropriate for copyright actions).

In sum, Congress provided no directive mandating use of the injury rule to govern the accrual of claims under the Copyright Act. We conclude that use of the discovery rule comports with the text, structure, legislative history and

_____

the discovery rule, and that these doctrines are distinct. However, as discussed above, the legislative history demonstrates that Congress rejected the inclusion of specific exceptions to the Copyright Act's statute of limitations in order to allow the courts to consider any equitable considerations necessary to ensure that copyright holders' rights were fairly protected. As we have explained, the "discovery rule originated as an equitable doctrine to extend the period during which victims of latent injuries could seek recovery." *Disabled in Action*, 539 F.3d at 216 n.16 (emphasis omitted). As this case demonstrates, there are certain infringements which, like latent injuries, a plaintiff cannot reasonably be expected to discover at the time it occurred. Thus, we believe that Congress' expressed intent to allow the courts to consider equitable circumstances to extend the time for filing an infringement action is consistent with use of the discovery rule.

underlying policies of the Copyright Act.  Thus, consistent with *Disabled in Action* and in agreement with our sister courts of appeals, we hold that the federal discovery rule governs the accrual of civil claims brought under the Copyright Act.

## 2.  Application of the Discovery Rule

The first jury proceeded to calculate damages having been instructed to use the discovery rule in light of the District Court's rejection of USI's arguments in favor of the injury rule. Nonetheless, despite the jury's finding to the contrary, the District Court overturned the jury's determination and ruled that, under the discovery rule, Graham's cause of action for copyright infringement accrued in the fall of 1991 after Haughey left Graham to work at USI's predecessor company.  Accordingly, the District Court granted USI's motion for a new trial.  After cross-motions for summary judgment, the Court granted USI judgment as a matter of law as to Graham's infringement claims for acts of infringement that occurred before February 9, 2002. According to the District Court, "storm warnings or suspicious circumstances about possible infringement were compelling long before February 9, 2002, but Graham ignored them."  *Graham*, 484 F. Supp. 2d. at 336.  Therefore, Graham could recover only for acts of infringement that occurred within the three year period prior to its filing of the instant action (i.e., acts occurring on or after February 9, 2002).

In reviewing the District Court's decision to grant a new trial, we apply an abuse of discretion standard.  *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 206 (3d Cir. 1992). Where, as here, a district court grants a motion for a new trial because it determines that the jury verdict was against the weight of the evidence, it is "'the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial'" in order to protect the jury's fact-finding role.  *Id.* at 211 (quoting *Lind v. Schenley Indus. Inc.*, 278 F.2d 79, 90 (3d Cir. 1960) (en banc)).  As to the District Court's grant of summary judgment, our review is plenary.  *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227

19

F.3d 78, 88 (3d Cir. 2000).

Graham challenges both the District Court's ruling that USI was entitled to a new trial on the statute of limitations and its subsequent grant of summary judgment to USI on that issue. That is, Graham argues that the evidence was sufficient to support the first jury's finding that Graham was not chargeable with knowledge of USI's infringement prior to February 9, 2002. Accordingly, Graham contends that we should reinstate the first jury's verdict in favor of Graham in the amount of $16,561,230 against USI and $2,297,397 against Haughey.

### 3. Storm Warnings

We reiterate that, under the discovery rule, a cause of action accrues "'when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.'" *Disabled in Action*, 539 F.3d at 209 (quoting *Romero*, 404 F.3d at 222). Applying that precept here, we ask whether Graham "should have known of the basis for [its] claims [, which] depends on whether [it] had sufficient information of possible wrongdoing to place [it] on inquiry notice or to excite storm warnings of culpable activity." *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400 (3d Cir. 2006) (quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 (3d Cir. 2002)) (internal quotation marks omitted). USI and Haughey bear the burden of demonstrating such storm warnings and, if they do so, "the burden shifts to [Graham] to show that [it] exercised reasonable due diligence and yet [was] unable to discover [its] injuries." *Id.* (quoting *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 252 (3d Cir. 2001)).

Graham first contends that the District Court erred because the storm warnings relied upon by the District Court predated the first act of infringement. As we have previously explained, "[b]ecause a potential plaintiff cannot discover his injury before it has occurred, the discovery rule only *postpones* the accrual date of a claim where the plaintiff is unaware of the injury. It does not *accelerate* the accrual date when the plaintiff

20

becomes aware that he will suffer injury in the future." *Disabled in Action*, 539 F.3d at 214 (quotations, alterations, and internal citation omitted). Thus, "the first step in applying the discovery rule . . . is to establish when the injurious . . . act defined by the statute actually occurred." *Id.* Next, we must "determine whether that injury was immediately discoverable, or whether the accrual date will be *postponed* until it is reasonable to expect the plaintiff to discover the injury." *Id.*

Although the District Court recognized that the statute of limitations could not have begun to run until the first act of infringement occurred in July 1992, the Court concluded that it saw "no reason why the clock on Graham's claims should not have started to run at the time when Haughey first began to infringe, since there is no sign that any of the storm warnings had abated by that point. Graham is incorrect in its contention that storm warnings must warn of an actual injury that has already taken place. . . . A copyright owner has the duty to investigate indications that infringement is in the offing, even if, in the course of the investigation, it learns that infringement has not yet occurred." *Graham*, 484 F. Supp. 2d at 334 (citing *Benak*, 435 F.3d at 400-01; *Mathews,* 260 F.3d at 251-52).

We do not agree that the discovery rule operates in the manner suggested by the District Court. Significantly, neither of our precedents relied upon by the District Court for the proposition that a copyright owner has a duty to investigate infringement "in the offing" supports such a rule. In both cases, which dealt with a securities action and RICO action, not copyright infringement, we held that the plaintiffs' claims were untimely under the discovery rule because storm warnings of the alleged wrongs put the plaintiffs on inquiry notice before the relevant date. In fact, the storm warnings arose after the alleged wrongs. *Benak*, 435 F.3d at 398-99, 403; *Mathews*, 260 F.3d at 244, 253-54. Thus, *Benak* and *Mathews* do not stand for the proposition that prospective plaintiffs have a duty to inquire into future wrongdoing. Rather, they dealt with the time at which inquiry notice arose for past wrongs.

Indeed, we have rejected the proposition that the

discovery rule places a duty on prospective plaintiffs to inquire into possible future wrongful conduct. For example, in *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 384 (3d Cir. 2004), we held that several claims for tortious interference of contract did not accrue "until, at least, the plaintiff suffer[ed] injury . . . as a result of the defendant's conduct." We rejected the defendant's argument that "mere notice of termination [of the plaintiff's contracts] triggered the claim" because the plaintiff did not suffer a legally cognizable injury until the contracts were actually terminated. *Id.* We stated: "Sunrise [the defendant] attempts to take that unremarkable proposition–that the statute of limitations should be *postponed* where the victim is unaware of the injury–and reverse it, so as to mandate that the statute of limitations *accelerates* when the victim becomes aware that he will suffer injury in the future. That is logically fallacious." *Id.* Further, we analogized *CGB* to a case in which one person tells another "that, in three months, he intends to trespass. The tort of trespass has not occurred until the victim's property is entered by the tortfeasor. That the victim was informed in advance of the inevitable does not alter the accrual of his damages action for trespass." *Id.* at 384 n.9. USI's argument is no different than the one we rejected in *CGB*.

The District Court also saw storm warnings in Haughey's departure from Graham, even though that departure was ten months before Haughey began to infringe. That departure in itself cannot be considered a storm warning because a copyright owner does not have a duty to ferret out potential acts of infringement before they occur. *Cf. MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 780 (3d Cir. 1991) (rejecting argument that a copyright infringement claim was barred by laches because "the district court's laches rationale would have put [plaintiff] under a never ending obligation to discover whether anyone to whom he ever supplied his software would copy it," an obligation that the "Copyright Act does not recognize"). The District Court feared that, if a copyright owner did not have a duty to investigate infringement in the offing, then "Haughey could have told Graham on day one that he was anticipating infringing on day two, and because he

22

was not infringing on day one, the statute of limitations would have been tolled for years without the need for any further action on the part of Graham." *Graham*, 484 F. Supp. 2d at 334. That hypothetical is simply not our case.

We have previously recognized that the aggregate "'mix of information' may constitute a storm warning." *Mathews*, 260 F.3d at 252. Before determining whether this is such a case, we must first address each of the District Court's purported storm warnings separately. High on the District Court's list of reasons for its conclusion that there were ample storm warnings was its focus on Haughey's retention of a copy of the Standard Works when he left Graham in September 1991. However, as the District Court recognized, possession of a copy of a work alone does not constitute copyright infringement or a storm warning thereof. *Graham*, 484 F. Supp. 2d at 331; *see also* 17 U.S.C. § 106 (enumerating exclusive rights of copyright owner). Nonetheless, the District Court concluded that a storm warning existed here because Graham was on notice that the "only real use Haughey would have for the Works was to copy them in violation of Graham's copyright." 484 F. Supp. 2d at 336. That was a jury argument and the record before the first jury did not compel that inference.

Although the jury heard evidence that the Works were valuable because they could be easily copied to provide consistent and accurate explanations of coverage, the jury also heard evidence that producers at both Graham and USI used the Works as reference materials (without directly copying any text) because they included instructions and checklists for producers to use when creating proposals for clients.

The mere fact that a copyright owner has notice that another person also possessed its copyrighted material and may find it useful to copy should not and does not by itself constitute a storm warning of possible infringement. *Cf. Warren Freedenfeld Assocs.*, 531 F.3d at 45 ("There is no presumption that failed business relationships inevitably will give rise either to tortious conduct or disregard of proprietary rights. That a relationship between an architect and a client has become frayed

23

and the client has decided to forge ahead with the project by engaging some other architect does not, in and of itself, serve as a harbinger of an intention to violate the original architect's copyright protection.").

The District Court (in its summary judgment decision) also concluded that Graham had a storm warning of Haughey's (yet-to-occur) infringement based upon Haughey's improper solicitation of Graham's clients, in violation of his employment and termination agreements. However, improper solicitation of business, if it in fact occurred, is a far cry from copyright infringement. In *In re Merck & Co., Inc. Secs., Derivative & "ERISA" Litig.*, 543 F.3d 150 (3d Cir. 2008), we dealt with application of the discovery rule to allegations of securities fraud. We held that "simply stating that a smattering of evidence hinted at the possibility of some type of fraud does not answer the question whether there was 'sufficient information of possible wrongdoing . . . to excite storm warnings of culpable activity' under the securities laws." *Id.* at 164 (quoting *Benak*, 435 F.3d at 400) (emphasis omitted) (alteration in original). Thus, we concluded that the FDA's public allegations of misrepresentations by Merck in its consumer advertisements were not a storm warning of the securities fraud alleged. *Id.* at 169-72.

Similarly, even if Graham knew that Haughey had improperly solicited certain of Graham's clients, that wrongdoing did not put Graham on notice of Haughey's copyright infringement. The District Court stated that this conduct was a storm warning of infringement because a "person who had breached an agreement with Graham in this regard is likely to infringe the copyright on its Works." *Graham*, 484 F. Supp. 2d at 336. However, inquiry notice demands more than evidence that a person is a bad actor in some general sense before a court can conclude that a storm warning exists as to a specific cause of action.

Moreover, after Graham discovered Haughey's alleged improper solicitation of clients in October 1991, it got Haughey to agree to stop and, significantly, in November 1991, just a

month later, sold Haughey and FOG six of Haughey's old client accounts. Thus, by the time of the first act of infringement in July 1992, Haughey's alleged solicitation of clients was an old problem that the parties had resolved, not a storm warning of Haughey's infringement.

Indeed, Graham's course of conduct at the time of Haughey's separation from Graham demonstrates that Graham diligently sought to protect its rights in the Standard Works. In his employment and termination agreements, as well as in the November 1991 agreement selling certain client accounts to FOG, Haughey repeatedly agreed to respect Graham's rights to its intellectual property, including specifically the Standard Works. The District Court downplayed the significance of Graham's copyright notices, stating: "Graham obviously did not deem the copyrights on the Works in and of themselves to be a sufficient deterrent to infringement. Otherwise, it would not have needed to negotiate a reaffirmation of Haughey's obligation to turn over the binders [containing the Works] upon his departure . . . ." *Graham*, 484 F. Supp. 2d at 333. That is, the District Court seemed to suggest that the fact that Graham sought to buttress its statutory rights under the Copyright Act with contractual obligations implied that Graham was on notice of Haughey's (yet-to-occur) infringement. The jury was entitled to make the opposite inference, i.e., that Graham was diligently protecting its rights.

The evidence before the jury was sufficient to support its conclusion that Graham was not on notice of Haughey's (and USI's) infringement prior to February 9, 2002. There is no evidence to suggest that Graham had actual knowledge of any infringement until 2004. Even if Graham was or should have been aware that Haughey possessed a copy of the Standard Works when he left Graham, the jury heard testimony that Haughey was aware that the Standard Works were confidential information and that Graham had copyrighted them. The jury also heard evidence that Haughey promised (in the November 1991 agreement) to hold Graham's proprietary information, including specifically the Standard Works, "in trust . . . [and] confidence," app. at 2084, and agreed not to "use, divulge, or

25

otherwise disclose" such information, *id.* Finally, the jury knew that after Haughey and USI infringed the copyrighted material in the Standard Works in a number of client proposals, these proposals were kept confidential by USI.

To summarize, USI was not entitled to judgment as a matter of law on the statute of limitations issue (and therefore the District Court erred in granting USI summary judgment) because the evidence before the first jury was clearly sufficient to support its finding that Graham was not on inquiry notice of Haughey's and USI's infringement before February 9, 2002 (and therefore the District Court abused its discretion in granting USI's motion for a new trial). Our conclusion should lead us to reinstate the first jury's verdict, but, relying on its ruling with respect to the statute of limitations issue, the District Court declined to reach USI's alternative arguments for a new trial. First, USI preserved its argument that the jury's apportionment of the defendants' profits between those that were attributable to infringement (and thus recoverable by Graham) and those that were attributable to other factors (and thus not properly part of the damages calculation) was against the weight of the evidence. Second, USI argued that the verdict was excessive. We will therefore remand the case to the District Court to allow it to consider these issues in the first instance.

### B. Causation

We turn to USI's cross-appeal. USI contends that Graham cannot recover on any of its infringement claims because it failed to prove a legally sufficient causal connection between the copyright infringement at issue and the profits of USI and Haughey that the jury awarded to Graham as compensation for that infringement. The District Court rejected that argument in USI's post-trial motion for judgment as a matter of law.[9]

---

[9] We exercise plenary review of that denial. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

26

As relevant here, the Copyright Act provides that the "copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement . . . . In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Graham's theory of recovery was that it was entitled to USI's and Haughey's commissions as "indirect profits" of infringement (i.e., profits earned not by selling an infringing product, but rather earned from the infringer's operations that were enhanced by the infringement). As explained by the Ninth Circuit, "§ 504(b) creates a two-step framework for recovery of indirect profits: 1) the copyright claimant must first show a causal nexus between the infringement and the [infringer's] gross revenue; and 2) once the casual nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement." *Polar Bear Prods.*, 384 F.3d at 711.

USI contends that Graham failed to satisfy its burden because Graham lacked any evidence connecting "the infringement–that is to say, the use of Graham's copyrighted language–and the decision of the client to purchase insurance through USI." USI's Br. at 66. However, Graham's expert identified client proposals issued by USI that included infringing language and then calculated the revenues obtained by USI from those clients after the client had received an infringing proposal. The jury also heard testimony from USI personnel that the written proposals (including, presumably, those with infringing language) were an important part of the sales process–in fact, Haughey even testified that some clients were convinced to purchase insurance through USI on the basis of the proposals–and that it was USI's practice to review the proposal's contents "page by page" with the client. Moreover, Graham introduced evidence that the Standard Works were valuable in part because they could be easily copied to provide consistent and accurate explanations of coverage comprehensible to lay people. Graham also introduced evidence that FOG had nothing like the Standard Works when Haughey first arrived; that FOG

27

and USI made electronic and paper copies of the Standard Works available to their employees; and that FOG and USI encouraged their producers to use the Standard Works. Finally, the District Court instructed the jury that it could draw an inference against USI based on USI's destruction of evidence relevant to infringement (certain client proposals).

We agree with the District Court that a reasonable jury could conclude from this evidence that Graham met its initial burden to demonstrate that the infringement contributed to USI's profits. The opinion of the Court of Appeals for the Eighth Circuit in *Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789 (8th Cir. 2003), is instructive. There, Volkswagen (d/b/a Audi) infringed Andreas' copyrighted poem by including text from the poem in one commercial that was part of a three-commercial ad campaign for the Audi TT automobile. *Id*. at 791-92. After the jury awarded Andreas a portion of Audi's profits for the Audi TT during the period of infringement, the district court granted Audi judgment as a matter of law. *Id.* The Court of Appeals reversed, holding that Andreas only bore the burden of proving "whether Audi profited from the infringing commercial at all." *Id.* at 796. It concluded that Audi did so in light of evidence that the "infringement was the centerpiece of [the] commercial;" that "Audi enthusiastically presented the commercial to its dealers;" that sales of the Audi TT exceeded projections; that the ad campaign received high ratings; and that Audi paid its advertising consultant a bonus based on the success of the campaign. *Id.* at 796-97.

Similarly, Graham appropriately sought to recover only USI's and Haughey's commissions from their clients that were provided with infringing proposals. Graham also showed that the written proposals were important to USI's clients, that the infringed language from the Standard Works contributed to the success of those proposals, and that USI urged its employees to use the Standard Works.

In *Andreas*, the Eighth Circuit also rejected Audi's argument that Andreas was required to provide testimony that purchasing decisions were influenced by the commercial,

reasoning that "[o]nce a nexus was shown . . . [and] Andreas establish[ed] Audi's gross revenue . . . [,]Audi then bore the burden of establishing that its profit was attributable to factors other than the infringing words: the other two commercials[,] . . . customer loyalty, brand recognition, etc."  336 F.3d at 797. Similarly, as noted by Graham, USI's contention that Graham was required to show that the infringement was "an essential and integral key" to its clients' decisions to purchase insurance through USI misconstrues the parties' burdens of proof under 17 U.S.C. § 504(b).  USI's Br. at 68.  This argument relates to the apportionment of USI's profits between USI's infringing and non-infringing conduct, a matter over which USI bore the burden of proof.[10]  In order to satisfy its initial burden of proof, Graham was required to prove only that the profits it sought to recover were "reasonably related to the infringement," *On Davis v. Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001), and Graham did so here.

In sum, the District Court correctly rejected USI's motion for judgment as a matter of law on the issue of causation after finding that Graham had satisfied its burden of proof under 17 U.S.C. § 504(b).  On remand, USI may renew its related contentions that the jury's apportionment of its profits was against the weight of the evidence and that the verdict was excessive.

## III.

## CONCLUSION

We will affirm the District Court's rejection of USI's motion for judgment as a matter of law with respect to the causation issue.  Although we agree with the District Court's ruling that the discovery rule applies to copyright infringement

---

[10]  Indeed, at trial, USI presented evidence on the issue of apportionment and devoted a significant portion of its closing argument to the issue, and the jury ultimately reduced Graham's requested profits by thirty percent to account for the contribution of USI's non-infringing conduct to its revenues.

claims, we will reverse the District Court's orders granting USI's motions for a new trial and summary judgment with respect to accrual of the statute of limitations issue. We remand only so that the District Court may decide defendants' arguments concerning apportionment and excessiveness of the verdict. If the District Court rejects these arguments, it shall reinstate the verdict of the first jury and undertake any necessary further proceedings consistent with this opinion.